UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHRISTOPHER PIERCE-COOKE,

    Plaintiff,

    v.                                                                   CIVIL ACTION NO. 23-10367-MPK[1]

BRUCE A. WHEELER,

    Defendant.

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

KELLEY, U.S.M.J.

I. <u>Introduction</u>.

    The Plaintiff, Christopher Pierce-Cooke, was the victim of an email scam in which a wire transfer of $208,951.98 was diverted, and instead of going to his bank account, was sent to an account controlled by the Defendant, Bruce A. Wheeler. Wheeler, who claims he did not suspect he was part of a scam, forwarded the money to a bank account in China, as directed by someone in China with whom he says he thought he was in business. The money was never recovered. Pierce-Cooke sued Wheeler for Fraud (Count I), Conversion (Count II), Unjust Enrichment (Count III), and Negligent Misrepresentation (Count IV), and brought claims under Mass. Gen. Laws ch. 93A (Count V) and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Count VI). (#1.)

    For the reasons set out below, after considering the evidence presented at trial, I find that Pierce-Cooke has met his burden to prove by a preponderance of the evidence that Wheeler is liable for Conversion (Count II). Wheeler is not liable for any other counts.

---

[1] The parties consented to proceeding before a United States Magistrate Judge, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). (#9.)

II. <u>The Evidentiary Record</u>.

A bench trial was held on June 10, 2025, with Wheeler proceeding pro se. (#63.) The only witnesses at trial were Pierce-Cooke and Wheeler. Twenty-three uncontested exhibits, mainly consisting of emails between Wheeler and a person apparently located in China named "Sunny Deng" ("Deng"), were introduced into evidence. (Tr. at 5); *see* #64 (list of exhibits).[2]

Wheeler did not dispute the underlying facts: that Pierce-Cooke was the victim of an email scam in which $208,951.98 belonging to him was sent to a bank account that Wheeler controlled, and that Wheeler forwarded the money to a bank account in China at the direction of Deng, who was part of the scam. As mentioned, Wheeler asserted that he did not know that he was participating in a scam, claiming that he was also a victim, because Deng tricked him into believing that he was Deng's partner in a legitimate business. (Tr. at 12-15.) The factual findings below are based on the numerous emails between Wheeler and Deng, which they exchanged from February to November 2022, and Wheeler's testimony at trial about those communications and his mental state when he took certain actions, and so the emails and Wheeler's testimony are set out in considerable detail below.

A. <u>Pierce-Cooke's Testimony</u>.

Pierce-Cooke, a resident of New Jersey, testified that he is a businessman. *Id*. at 16-18. From January 2018 to January 2021, he was the chief executive officer of a company based in Amsterdam called "Walking the Talk," a consulting firm that helped businesses "implement a culture." *Id*. at 17-18. In 2022, he "brokered the sale of the company[,]" and since he was a 4.7 percent shareholder, he received an "upfront cash payment and then three one-year earnout payments, the first of which is at issue [in this case]." *Id*. at 18-19.

---

[2] The docket will be cited as (# ). The transcript of the trial (#65) will be cited as (Tr.). Exhibits admitted into evidence at trial (#64) will be cited as (Ex.).

In June 2022, Pierce-Cooke, using a business email account, arranged with Barbara Geels Dingle, the chief operating officer of Walking the Talk, to wire the first earnout payment of $208,951.98 from Rabobank, a Dutch bank used by Walking the Talk, to his Citibank account. *Id*. at 21-23. His email account was hacked, however, and fake emails were sent to Ms. Dingle, directing her to send the money to an account at Bank of America ("BOA") that was not his. *Id*. at 23-25. Pierce-Cooke said that the hack was made possible because "there is a rule within the [email] system that none of us knew about whereby emails could be filtered or fit to a separate folder and held there and/or they could be manipulated there." *Id*. at 20. The hacker's emails to Ms. Dingle appeared to be from Pierce-Cooke. *Id*. In addition, Pierce-Cooke's emails were "analyzed" by a software program so that the hacker's emails mimicked Pierce-Cooke's "words and [his] tone to make the [fake] messages sound legitimate." *Id*. at 24-25. When he realized the money was gone, Pierce-Cooke reported the theft to the North Wildwood, New Jersey police, the "FCC," and the FBI. *Id*. at 20. The money was never recovered. *Id*.

B. Wheeler's Testimony.

1. Wheeler's Background.

Wheeler, who lives in Weymouth, Massachusetts, testified that he graduated from San Diego State University with a B.S. in finance. *Id*. at 26, 28. He operates a contracting business called ProShield Exteriors, which primarily does "siding, roofing, [and] some painting." *Id*. at 26, 27. He does not have any employees; he hires subcontractors and might, for example, use five subcontractors at a time to do a "roofing job." *Id*. at 27. He worked from 1993 to 1997 at Sprint, and returned to Sprint in 2003 and worked there until 2018. *Id*. at 27-28. At Sprint, he "ran the sales teams for national accounts" such as "Bose, The Hartford, Travelers. [He] basically coordinated the entire sales team and grew the account." *Id*. at 28.

Wheeler and his wife divorced in 2018, after which things were "more difficult" for him financially. *Id*. at 34. His divorce was "extremely, extremely ugly." *Id*. at 32. At the time he left his job at Sprint in 2018, he "basically had a nervous breakdown" and "could not function anymore." *Id*. He suggested that he has lasting mental health issues: "I lost my stuff, and I frankly am not even near 100 percent." *Id*.

In 2018, Wheeler "got the real estate bug" and for a year tried to establish a business buying distressed properties, but he disliked the business and stopped. *Id*. at 29. Over the years he has had business and personal accounts at banks, and brokerage accounts with E Trade, Trade Station, Schwab, and UBS. *Id*. at 29-30.

2. <u>Wheeler Agrees to Work with Deng</u>.

On February 14, 2022, Wheeler received an email from Sunny Deng.[3] *Id*. at 36. The email read:

> Hello,
>
> Please would you like to cooperate with our company to become our business partner/representative in USA
>
> We are ready to be paying 4% commission on each transaction.
>
> Please get back to us for more information
>
> **NB: Reply to Email: sales@qingdaoscooters.com**
>
> Thank you.
>
> **Sunny Deng**
> Import/Export Manager
> -----------------------------------------------------------
>
> **QINGDAO HARVEST IMP & EXP CO., LTD**
> **No. 115 Mingyuan Avenue North, Yongkang, Zhejiang**
> **Wechat:** wxid_5oxsyopiz9u922

---

[3] The emails between Deng and Wheeler are repeated verbatim without use of the sic notation.

Email: ***sales@qingdaoscooters.com***

(Ex. 6 at 6-7) (emphases in original). Wheeler testified at trial that although he had never heard of Deng or Qingdao Scooters, and the email was not addressed specifically to him but was a "generic solicitation," the email "appeared legitimate" to him. (Tr. at 13, 36-37.)[4]

> Wheeler replied:
>
> Hello – I received your message a moment ago.  What does becoming a business partner with your company entail or consist of?  Best – Bruce
>
> Bruce Wheeler
> Managing Owner
> **ProShield**
> **1100 Washington St., Suite #1 HANOVER**

(Ex. 6 at 6) (emphases in original).  The next day, Deng described his company, Qingdao Harvest Imp & Exp Co., Ltd. ("Qingdao"), as

> a professional manufacturer of mobility scooter, electric scooter, electric bike, electric wheel chair, the company engaged in the development of mobility scooter, development and production has rich experience. Has nearly ten elite technical backbone, enterprise scale is growing, increasing technical force, for the electric scooter market provides a higher professional technology level and model of chasing the market.
>
> QINGDAO HARVEST company adhering to the 'quality service to the end!' Enterprise concept, in product quality, technology development, operation management, customer service, market regulation, depth in areas such as intensive cultivation, in order to exert better social and economic benefits. Based on domestic, break into the European and American high-end exports southeast Asia and other international markets.  Let the constant towards internationalization and modernization of the higher the starting line.

---

[4] Wheeler said in his opening statement that after he received the initial email, he "naturally did as much due diligence as [he] knew how to do." (Tr. at 13.) "Their email appeared legitimate. Sales came down to scooters.com. Their website checked out. And even today Qingdao Scooters comes up on Google and Alibaba, eBay overseas." *Id.* When he was testifying, when asked what the website looked like, he said: "It looked like any foreign sales-based—it kind of looked like Alibaba or kind of like eBay almost. They had different models of electric scooter. It looked legit." *Id.* at 160.

*Id*. at 4-5.[5]

As Deng and Wheeler exchanged emails over the following days, Deng presented Wheeler with a business proposition in which Wheeler would register a new company in the United States, receive product orders from the United States and Canada, send monthly reports, and open a corporate bank account for the newly-registered company, and in return, Wheeler would receive a 4% commission "on any order received by [him]. (Example if receive order of $200,000 in a month commission will be $8000)." *Id*. at 4. Wheeler suggested he register the company as an "LLC," which would cost $669; Deng approved and said his company would reimburse Wheeler for the registration. *Id*. at 3-4. Deng also proposed that "[a]lternatively to avoid any stress, you may decide to use your existing company for this purpose[,]" to which Wheeler replied, "I would prefer to keep my existing business out of this." *Id.* Wheeler asked detailed questions about the requirement that he receive orders from customers, to which Deng replied: "This will not take your time as the purchase orders you receive is by email and the customer will also copy the head office and keep you in the loop for production[.]" *Id.* at 3. Deng also said that Wheeler would receive a Qingdao email account, *see id*., although that never happened. (Tr. at 70-71.)

In an apparent effort to explain why the company needed Wheeler's services, Deng stated that in China "[t]he rate of corporate income tax is 25% and in recent times we have experienced an increase in raw materials by more than four times since January 2021." (Ex. 6 at 5.) He said that "[w]e only pay 7% Tax if we receive payments from you to our personal account in China or to our bank in Singapore. This will help us to save and continue to be in business without fear of

---

[5] At trial, when counsel for Pierce-Cooke pointed out that the second paragraph of Deng's email was nonsensical, Wheeler responded: "Candidly, this is – I may even be reading this for the very first time. This to me appears to be boilerplate stuff that every company supplies their potential clients." (Tr. at 39-40.) Wheeler also testified that when he was working at Sprint he often "communicated with China and Japan and so forth" and was used to receiving foreign emails where "you often see non sequiturs and different use of verbiage and so forth." *Id*. at 46.

compromising." *Id*. at 5-6.

On February 18, four days after receiving Deng's initial email, Wheeler emailed that he "fel[t] comfortable moving forward" and would "front the money to initiate the LLC as it represents minimal risk." *Id*. at 2. When questioned at trial about his state of mind regarding the risk of paying to set up the LLC, Wheeler admitted that he thought that there was some chance that he "[might] not see that money again," "but that [the risk] was minimal." (Tr. at 53.) He said he was willing to risk the cost of the registration, which was $669, but "if it was $3,000, [he] probably wouldn't have done it," because "[he] didn't know if [he] was going to be reimbursed." *Id*. When he was reimbursed, Wheeler felt that it was "further proof to me that, you know, if the entity that's contacting me and wanting to partner as an agent, they'll put their money where their mouth is. I mean, it's a nominal amount, $669, but it showed me their commitment." *Id*. at 52-53.

In his February 18 email, Wheeler requested further information, including:

1. the past 12 months revenue figure for US and Canada you indicated was $3,680,000. I'd like to see the monthly figures and confirm that all future US and Canadian revenues would be flowing through the new LLC and associated business checking account.

…                                              .                                              .

4. I assume we will be entering into some form of contractual agreement stating mutual responsibilities and compensation. Please advise on that and thank you. I look forward to your reply.

(Ex. 6 at 2.)

Deng provided Wheeler with an "Agent Agreement," which Wheeler later signed. (Ex. 7 at 1-2, 8-11.)[6] It is not clear from the evidence whether the "monthly figures" Wheeler requested

---

[6] The Agreement, written in broken English, said that the Agent would be "the representative and contact point" for Qingdao, and was responsible for receiving orders from customers and sending them to the "manufacturer to prepare the invoice." *Id*. at 8. It listed the BOA account that Wheeler had opened under "AGENT'S BANKING INFORMATION TO RECEIVE PAYMENT" but did

were ever provided, *see* Ex. 9 at 7. Although Deng told Wheeler he would receive orders from customers, and although the Agent Agreement stated that he would do that and send the orders to the manufacturer, "that never actually happened" (Tr. at 46); all Wheeler did was "open bank accounts, receive money and then transmit those funds out[.]" *Id*. at 65. Wheeler admitted at trial that before entering into the agreement with Deng, he had never "done an international wire, much less a wire," and did not understand how to do one. *Id*. at 69. When asked why he thought Qingdao, which supposedly sold millions of dollars' worth of product in the United States, wanted him to "do[] their bank transactions[,]" Wheeler did not answer. *Id*.

3. Wheeler Registers an LLC and Opens Bank Accounts for Qingdao.

On February 24, Wheeler registered "Qingdao Harvest, LLC"[7] as a limited liability company with the Secretary of the Commonwealth of Massachusetts, listing himself as the Resident Agent. (Tr. at 54-55; Ex. 7 at 14-15.) On the registration form he stated that the purpose of the business was the "sale of electrical mobility devices." (Ex. 7 at 14.) Wheeler was the sole member of the LLC. (Tr. at 55.) On the registration form, he listed the location of the principal office, the street address of the office where records would be maintained, and his address as "Resident Agent" as 1100 Washington Street, STE I, Hanover, MA 02339, *see* Ex. 7 at 14, which was the address of his contracting business. (#5 ¶ 17.)

On March 2, Wheeler opened a Bank of America account ("the BOA account") on behalf of Qingdao, naming himself "manager" of the company. (Ex. 3 at 1.) That same day, Wheeler sent Deng the signed Agent Agreement containing the BOA account's routing and account numbers,

---

not list any information under "QINGDAO HARVEST IMP & EXPORT CO., LTD BANKING INFORMATION." *Id.* at 10.

[7] Both the company in China and the company registered by Wheeler in Massachusetts will be referred to as "Qingdao."

along with Qingdao's articles of incorporation and a copy of his driver's license. (Ex. 8 at 7.)

Days later, Deng emailed Wheeler and suggested that he open a bank account at a second bank, JP Morgan Chase ("Chase"), "so we can have two banks running perfectly with different orders to avoid having many payments on single account." *Id.* at 5. Deng continued, "The BOA account should be sufficient but in a case whereby we have many orders, is not ideal to receive all payments in one account for sending out reasons." *Id*. Wheeler opened the second account at Chase later that day. *Id.* at 4. Wheeler testified at trial that although he had "no idea" why there would "be any issue sending out payments from an account[,]" *see* Tr. at 64, he did not find Deng's request to open a second account odd: "No red flags were raised, so to speak." *Id*. at 63. He said that he did not open an account at Citizens Bank ("Citizens"), where he already "had a relationship" because he had a business account there with his contracting company, because he "assum[ed] [Deng] was choosing very, very large multinational Banks like B of A, like JP Morgan Chase" instead of Citizens, which "is a regional bank at best." *Id.* at 59-60.

4. The Bank Accounts Receive Funds, Are Locked and Then Closed.

On March 8, Deng emailed Wheeler: "We have started sending invoices out to our customers today." (Ex. 10 at 10.) On March 11 he emailed, "We have issued invoices to all our customers" and asked Wheeler to check the BOA account to see "if you receive any payment today." *Id*. at 9. On March 21, Wheeler emailed Deng asking why, if he expected a payment on March 8, it had taken "nearly two weeks" for a deposit to appear in the account. Deng responded: "Some customers are asking for price reduction, and we are working on better ideal to work the price out and finalize with orders." *Id*. at 8. Wheeler emailed him back, "Interesting about the price reduction as I would think that your clients already agreed to a certain price but that's your business 😊 ." *Id*.

On March 24, Deng asked Wheeler to check the Chase account. The next day, Wheeler responded, "good news!" and informed Deng that there was a pending deposit of $76,560.00 in the account, from "WILLOW BIRCH PHA" ("Willow Birch"). *Id*. at 7-8. Wheeler testified that he did not know what Willow Birch was and he had no reason to ask Deng about it. (Tr. at 76-77.) On March 28, Wheeler, who had been trying to transfer the money to a bank account in Hong Kong as Deng had instructed him to, emailed Deng with an "update as [he] ha[d] not wired funds internationally previously," telling Deng that Chase would not allow him to transfer more than $50,000 each day. (Ex. 10 at 6.) Wheeler testified that it did not occur to him at the time that it was strange that he was being asked to funnel millions of dollars' worth of sales through accounts that had daily limits of $50,000 for wire transfers. *See* Tr. at 78-79 ("Didn't dawn on me at the time. Now it does that you pointed it out, but at the time, it didn't [] dawn on me."). The bank account in Hong Kong to which Wheeler was to transfer the funds was in the name of Ding Ligong. (Ex. 10 at 6.) Wheeler testified that he did not find it strange that the funds were not being sent to Qingdao, but instead to an individual he had not heard of before. (Tr. at 79-80.)

On March 31, after several back and forth emails about transferring the money in which Deng said the transfer should not take more than one day and urged Wheeler to expedite the transfer by going to the bank in person, *see* Ex. 10 at 4-6, Wheeler informed Deng that Willow Birch had reversed its payment and asked Deng to "advise as to why" that had happened. *Id*. at 3. Deng explained that the customer "complained about us delaying on giving them the estimated delivery time, and this us there first time to order from us so they instructed their bank to reverse the funds." *Id*. Deng also suggested to Wheeler that he "try to remit like $200 to the [Hong Kong] account from JP chase as a trial before you receive new payment just to ensure all will go well to avoid any future delay." *Id*. Wheeler agreed to transfer money from his personal account to the

BOA and Chase accounts and to move the money to the Hong Kong account. *Id.*

At trial, when Wheeler was asked if after the Willow Birch payment was reversed he had "any concern about the fact that [Deng] had been urging [him] to go to the bank [in person] and get the wires out[,]" Wheeler responded:

> Can't say that it did. It didn't raise any red flags. Now, perhaps—everything is clear in retrospect. But, you know, I'm just, the client made a decision to go in another direction. I didn't really think all that much about it.

(Tr. at 87.)

In the aftermath of the reversed payment by Willow Birch, Deng asked Wheeler again to send $200 of his own money to the Hong Kong account as a trial, but even though Wheeler previously said he would, he did not do it. (Ex. 10 at 1, 3.) On April 5, Wheeler emailed Deng that his account at Chase had been "locked" because of the reversed payment. *Id.* at 3. He also said, however, that his "daily wire limit" had been increased to $500,000 and he understood that international wires "can take up to five business days"; he told Deng that he would "contact BOA today as well to gauge their wire time frames and to ensure an adequate daily limit." *Id.* At trial, Wheeler testified that he was not fazed by the fact that his bank account at Chase was locked, because "[b]anks are extremely cautious with their clients' money" and at the time, he had "no idea if this [wa]s normal, abnormal[.]" (Tr. at 92, 95.)

Deng responded on April 11 that he was sorry the Chase account had been locked, but that "a new customer has paid $57,080" to the Chase account. He asked Wheeler to check the account and get back to him. (Ex. 10 at 2.) On April 13, Wheeler informed Deng that the Chase account was locked again for "suspicious activity" but that he would try to "resolve same" and would let Deng know if the "$50K has been received." *Id.* at 1. Later that day, Wheeler emailed Deng to tell him that Chase had closed his account "without any explanation." (Ex. 11 at 1.) He told Deng he

was "[v]ery confused" and asked Deng to "[p]lease advise what's going on," but he also offered to "open another account at a 3rd bank." *Id*. Even though at trial he testified that he understood that having an account closed by a bank was more serious than having an account locked, Wheeler still did not "extract" himself from his relationship with Deng or notify the authorities, because he thought "there must have been a plausible reason that [Deng] gave [him]" such that he did not "see anything going wrong here." (Tr. at 92-93.)

On April 16, Deng encouraged Wheeler to open a third bank account, at Citibank, *see* Ex. 12 at 4-5, but after looking into it, Wheeler learned there were no Citibank branches in Massachusetts. *Id*. at 4. He asked Deng if there were any other banks which would "suit [Deng's] business purposes." *Id*.

On April 22, Deng told Wheeler that there were "many invoices" issued that week and "we are sure payments coming next week." *Id*. at 3. On April 29, Wheeler told Deng he was checking the BOA account every day, *see id*. at 2; he testified at trial that at the time, he was not concerned about the delay, he was just "motivated to get [Deng] their money and me my money." (Tr. at 101.) Around three weeks later, Wheeler emailed Deng that he had not heard from him in a long time and was concerned, stating: "Please advise what's going on as I was under the impression that this was a business partnership and I believe I have executed my responsibilities in a timely fashion." (Ex. 12 at 2.) Wheeler testified that at this point he was "scratching [his] head because this is – this is different from the way th[e] relationship had started." (Tr. at 105.)

On May 20, nearly a month after Deng's April 22 email about "many invoices" being issued, Deng emailed Wheeler that they "finally got the large order payment done" and asked him to check the BOA account. (Ex. 12 at 1.) On May 24, Deng emailed Wheeler to tell him that a customer had sent a $529,062.50 payment, and further said:

…summer period is the season we usually have more sales and we have so many clients willing to make payment in that's same range which is why we needed to be sure all is okay with our BOA Account.  At this point to avoid losing the customers,

I will advise we use the Citizens Bank and Wells Fargo Bank on the Wheeler Group Inc and I will explain to customers to understand which am sure they will make the payment this week instead of losing them.

Please send banking details of both bank for us to prepare the invoices and mail out to customers as soon as possible.

(Ex. 13 at 4.)

Wheeler responded the same day, explaining to Deng that, contrary to Deng's suggestion that they use the "Citizens Bank and Wells Fargo Bank on the Wheeler Group Inc," he did not want to use his own business bank accounts for Qingdao "as [he] would prefer not to mix [his] existing business with [their] business." (Ex. 14 at 8.)[8] The next day, Wheeler emailed Deng that he had opened a new Citizens business checking account in the name of Qingdao Harvest. *Id.* at 5. The day after that, he told Deng that he thought it was "odd" that the "500K+ deposit" had not appeared in the BOA account five days after Deng told him to expect it. *Id*. at 4. At trial, Wheeler testified that he was asking Deng about the delayed deposit because Deng had told him the money was "coming in[,]" and "frankly 4 percent of 529,000 is over 20 grand, and yeah, of course I'm interested in that still coming." (Tr. at 114-15.) When pressed about why he never again asked Deng what happened to the deposit of about $529,000, Wheeler explained:

> [i]t seems, not having the background in this area, it seems like there's a lot of trouble with international wiring and so forth.  It's easy to look in hindsight, but it still didn't raise the red flags to the point where I'm like, uh-oh.

(Tr. at 112.)

Finally, on June 10, Wheeler emailed Deng, "[C]ongratulations! A deposit in the amount

---

[8] Wheeler, apparently referencing bank records that Deng had seen, further explained in the email that he did not have a business checking account at Wells Fargo, and "[a]s for The Wheeler Group, that is a mistake." (Ex. 14 at 8.)

of $208,951.98 is 'processing' in our BOA account." (Ex. 15 at 2.) Wheeler said at trial that even though this amount was different from the deposit of about $529,000 that Deng had specified would be made, he was not concerned because he "assumed this was a different sale." (Tr. at 113.) On June 13, Wheeler emailed Deng that he had a meeting with a "BOA banker" and would wire the deposit, less his four percent fee of about $8,300, as soon as possible. (Ex. 15 at 1.)

Wheeler testified that he could have asked at the bank about the source of the $208,951.98 deposit, but he "wouldn't be concerned with where it came from. [He] [was] concerned with [his] responsibility of wiring 96 per cent." (Tr. at 123.) Wheeler agreed that even though the information about the deposit indicated that it was "coming from" "Walking the Talk Limited" and read "Debt for Chris Pierce-Cooke," he would not have "questioned it at all. The name wouldn't matter to me. The money came into the account. 96 percent of it was wired out." *Id*. at 124. When he was asked what he thought at the time about "charges getting reversed, accounts getting locked or closed[,]" Wheeler said: ". . . you know what? It crossed my mind at the time that perhaps it's due to China because China is highly scrutinized for obvious reasons. But in my frame of mind, I certainly wasn't thinking scam." *Id.* at 126.

Deng responded on June 14 that the wire transfer had been received. (Ex. 17 at 5.) He also reminded Wheeler to look for "any trial payment like 0.01 or similar from Landmark Bio." *Id*. Wheeler, looking at the email, testified that "[i]t looks like they were testing the path for their next client that purchased something, Landmark Bio." (Tr. at 126.) On June 23, Deng asked Wheeler to check the BOA and Citizens accounts for a deposit of "$186k[.]" (Ex. 18 at 3.)

On June 24, Wheeler emailed Deng that the BOA account had been closed "due to risk[,]" reminded Deng that "this is the 2nd account that has been closed in the past few months[,]" and asked Deng how he wanted to proceed. *Id*. at 1. Wheeler was asked whether, at this point, any "red

flags were raised" for him; he responded:

> Yeah.  It's getting there. It is certainly getting there because closed, I got the answer that it's risk, a very general term. So maybe I'm at DEFCON 4 instead of DEFCON 5 at that point,[9] but I wasn't like, oh, this guy is a scammer, he's been lying to me from the get-go.

Tr. at 127-28.

When asked whether, since he was at "DEFCON 4," he "d[id] anything" or "ask[ed] any questions[,]" Wheeler said: "I did. I went to the bank, talked to the banker, spent time on hold, yeah." *Id*. at 128. He said that the banker told him that "we closed it due to risk[,]" to which Wheeler added, "Well, that could be any number of issues." *Id*. Finally, he said: "If it had come to my attention that it was due to fraud, it was canceled or closed due to fraud, yeah, that would have been, Okay, stop." *Id*.

Deng responded to Wheeler's June 24th email: "So many banks are always raising red flags on big payments and especially when payments received and sent out second day." (Ex. 17 at 1.) He suggested that they wait five days before transferring money out of the bank accounts, "as advised by the bank[,]" and added: "Please we need alternative of different business accounts with different banks if possible." *Id*. Deng also sent Wheeler a list of payments due from "Global Life Solutions USA LLC" that totaled $1,590,210.34. (Ex. 18 at 1.) Wheeler asked if "the figures below represent outstanding account receivables?" *Id.* Deng replied: "Yes and they will start paying from next week.  Please lets work something out to have more than one business account." *Id*. Wheeler replied that the Citizens account was the only account they had and asked: "Would you like me to

---

[9] "DEFCON" stands for "Defense Readiness Condition" and is used by the U.S. military to describe its readiness for situations of varying military severity. United States Department of Defense. April 12, 2001. Joint Publication 1-02: "Department of Defense Dictionary of Military and Associated Terms." https://jitc.fhu.disa.mil/jitc_dri/pdfs/jp1_02.pdf. DEFCON 5 signifies the lowest alert status, indicating "normal peacetime[,]" while DEFCON 1 signifies the highest. Sagan, S. D. (1985). "Nuclear Alerts and Crisis Management." International Security, 9(4), pp. 100-01. https://doi.org/10.2307/2538543.

open two more accounts on Mon., 6/27?" (Ex. 19 at 3.)

On June 28, Deng told Wheeler about another sum coming into the Citizens account and also encouraged him to link the bank accounts to https://www.kraken.com/, as "it is easier to send payment to us by Crypto bitcoin." (Ex. 19 at 1.) Wheeler testified that he knew a "little bit" about crypto: "My understanding is it's a bit less secure, subject to criminal activity. It's harder to trace funds." (Tr. at 131.) He added, "I've heard at some point the criminal enterprises in the world, you know, the underground and so forth, deal in crypto more frequently than otherwise." *Id*. at 132.

In emails sent on June 30, Wheeler informed Deng that a "deposit was made into our Citizens account in the amount of $90,213.26" from "Landmark Bio." (Ex. 20 at 1, 10.) He told Deng that he opened an account with Santander and said that he would check out "Kraken" as Deng had suggested, adding that he was "somewhat familiar with crypto" so he should not have any issues setting it up. (Ex. 21 at 1.) Finally, he warned Deng that he had "a few business and personal accounts with Citizens" and could not afford to have "that financial relationship severed," noting that because the accounts at Chase and BOA had been closed, he would not be allowed to open accounts with those banks again. *Id.*

In July, Citizens closed Wheeler's accounts, including his personal account and the account for his contracting business. (Ex. 22 at 6.) On July 11, Wheeler told Deng in an email that he had never received his check from BOA since that account had been closed "weeks ago." *Id*. Wheeler testified that the "check from BOA" to which he was referring was the roughly $8,300 he thought he was owed from the balance of Pierce-Cooke's $208,951.98 transfer. (Tr. at 137.) He said that after the account was closed, bank personnel told him: "[N]o, it's closed you're not getting anything." *Id.* (additional quotations omitted). Although, at trial, Wheeler was shown a copy of a cashier's check from BOA for $8,381.09 made out to Qingdao Harvest, that included Wheeler's

business address, *see generally* Ex. 2, he insisted that he never received any funds. (Tr. at 138-40.) Wheeler eventually received a letter from Citizens, dated July 13 and signed by "Fraud Operations," stating that after reviewing the Qingdao Harvest account, the bank "concluded that we can no longer maintain our banking relationship with you." (Ex. 22 at 7.)

    5. <u>Wheeler Learns the BOA Account Was Closed Due to Fraud and Is Contacted by the Police</u>.

    On August 1, Wheeler emailed Deng to tell him that he had not received any checks from the Citizens account. He also told him:

> I did find out something from BOA a little while ago that is very concerning. They told me that the reason they closed our account was due to fraud. Apparently the $208,000 deposit from your client came through Rabobank and Rabobank reported the fraud to BOA and froze the account. BOA will not be returning the 4% or ~$8,300 to me as well. Really not pleased with that after the significant amount of time spent on this endevor.
>
> I also just received a call from a local police detective who told me that a police detective from Wildwood, NJ who has been assigned to the BOA fraud case would be calling me to discuss further. Based upon this happening now three times, I doubt very much Citizens Bank will be returning the most recent ~$90K to me but I'll let you know the outcome of that as well. I'd appreciate an explanation from you as to the information I just shared. Thanks - Bruce.

(Ex. 23 at 7.)

    Deng responded that he "just sent email to our customer" to try to straighten things out, and that "as for the police detective you can show them proof that you are just our agent who doesn't have anything to do with this." *Id*. at 6.

    Wheeler responded:

> I'm not concerned that I will be accused of doing anything wrong. I'm concerned with not receiving the $8,300 from the $209,000 transaction last month as apparently BOA will return that to Rabobank who will return to your client who paid the $209,000. I'll look forward to hearing back on that as well as what you find out from your client who paid the $209,000 as I presume they are the ones who initiated the fraud allegation. Thanks and best – Bruce.

*Id*.

Wheeler testified concerning the email above that even after getting a call from the police detective telling him that there was a fraud investigation, he did not end his relationship with Deng because he still wanted to get his $8,300, which "[he] felt [he] deserved[.]" (Tr. at 146.) In response to questions from Pierce-Cooke's attorney, Wheeler testified:

> Q. And if you stopped the relationship or something or you helped figure out what this fraud was, that might keep you from getting your $8,300, right?
>
> A. Yeah.
>
> Q. So you didn't want to do that?
>
> A. No, I didn't.

*Id.*

In response to Wheeler's email requesting more information about the client's "fraud allegation," Deng replied:

> According to the email received from them which our customer received payment from a client which was claimed to be stolen funds and was wired to our customer's account and our customer wired same funds to you unknowingly to them. Now i will suggest you deduct your outstanding $8,300 commission once you receive the Cashiers cheque from Citizens bank which we are sure you will receive this as this doesn't have anything to do with the BOA.

(Ex. 23 at 6.)

The same day, Wheeler responded:

> …thank you for the update. I'm not entirely following your email below. Not sure how fluent you are with English as a call would be more productive. I unfortunately don't speak Mandarin or Cantonese 😊 .
>
> I received a call from a detective in NJ this afternoon (referred from the local detective I mentioned yesterday) who is working on behalf of Rabobank and your client who transferred the $209,000 to our BOA account. Apparently that client's email was hacked and said client could not access their banking information to prevent the transfer. I do not know anything further at this point.
>
> I received one check from Citizens today for ~$8,000 which was what was left in my business account (ProShield Exteriors). I did not receive a check for my personal account or our account for ~$90,000. Really confused and concerned with

what's going on. I will continue to operate faithfully based upon our agent agreement. Looking forward to sorting things out ASAP. Best – Bruce

*Id*. at 5.

Wheeler testified at trial that "Detective Kopetsky of the Wildwood Police Department" contacted him. (Tr. at 149-50.) Wheeler told the detective he would forward him the emails that he had exchanged with Deng, but he never did because he was "[b]usy, very busy with [his] construction or contracting business." *Id.* at 150-51. When I questioned him about what the detective had told him and why he did not cooperate in the investigation, Wheeler said:

I don't think they were able to prove fraud. It was reported to them by the plaintiff, obviously. They needed assistance with their investigation. I had some emails, but candidly, I didn't think a whole lot of it, you know. My fault.

*Id*. at 153.

Wheeler admitted that in August 2022 he was charged criminally in New Jersey "for involvement in fraud" but that the charge eventually was dropped. *Id.* at 154. He stated that he never got an attorney for that case, he never went to New Jersey to appear in court in connection with the charge, and he eventually received a letter—although he did not remember when—telling him the charge was dismissed. *Id.* at 159.

On August 5, Wheeler emailed Deng:

…I just [l]earned that Landmark Bio, who made the wire transfer, reversed the transfer on 7/7/22 and all that remains is the original $100 I opened the account with. Have you spoken with this client? Very interested to understand what's going on. Looking forward to your reply.  Best – Bruce.

(Ex. 23 at 4.)

6. Wheeler Still Wants To Do Business with Deng.

Deng did not respond to Wheeler's August 5 email asking Deng what happened with the Landmark Bio deposit until August 29, when he simply asked Wheeler if they could "continue [their] business" and asked if they could communicate by Skype messenger. *Id.* Wheeler replied

19

that he would be willing to "discuss moving forward with our business relationship" if Deng would pay him the $8,300 he was due from the transfer that went through (that is, Pierce-Cooke's funds). *Id* at 3. Deng replied, "I can understand you very well and this can be sorted once we start a new business, and your commission will be increased to 10%." *Id*. at 2. Wheeler responded the same day:

> …I wired ~$208,000 from BOA and 4% of same would be ~$8,300. Again, if you're willing to settle the past transaction and wire same to our Santander account, I will be amenable to moving forward with the new arrangement you proposed and via crypto if you wish. Please let me know and thank you. Best – Bruce.

*Id*.

At Deng's request, he followed up the email with another, listing the account and routing numbers for his personal Santander account. *Id*.

The final emails entered into evidence are dated November 4, 2022, when Deng asked Wheeler to advise "how we can move forward[,]" and Wheeler replied that he was "still waiting on the ~$8,000 payment from [Deng]" but was "[h]appy to move forward once same has been received." *Id*. at 1.

In his closing statement at trial, Wheeler said, "Am I complicit in moving money? Yes, because that's what I felt my job was. After I learned there was fraud, I still wanted to get paid what I thought was owed to me for the efforts." (Tr. at 159.) Finally, he said he was "extremely sorry" that Pierce-Cooke was "also a victim of this fraud[,]" and concluded:

> … I didn't know what was going on at the time. Should I have going out to August of 2022? Yeah, now that I'm hearing it out loud, yes, I should have. And if it turns out that the law views that as illegal, then I'll have to take my lumps.

*Id*. at 163.

III. <u>Findings of Fact</u>.

After observing his demeanor as he testified at trial and weighing the plausibility of his testimony against all of the evidence in this case, I accept Pierce-Cooke's testimony as true. After conducting the same exercise concerning Wheeler's testimony, however, I reject much of his testimony about his state of mind. Specifically, I do not find it credible that at the time he transferred Pierce-Cooke's money at Deng's direction, he did not know he was participating in some type of illegal conduct. This finding is reinforced by Wheeler's admitting in his testimony and closing argument, (albeit somewhat obliquely and without specifying precisely when he knew), that he knew there was a fraud and he assisted in it.

Wheeler appeared to me to be a rational, intelligent person, with a clear understanding of the proceedings and the questions that were put to him. He is a college graduate and held a managerial-level job at Sprint for many years. At the time of trial, he owned a contracting business where he supervised multiple workers, and there was no evidence that he had any difficulties doing his job. While he testified that he "basically had a nervous breakdown" in 2018 when he was going through a difficult divorce and lost his job at Sprint, and he said that he was "not 100% today," there was no evidence at trial that he suffered from any mental health issues at the time of the events in this case in 2022, nor did I discern any when he appeared in court before me. During the day in court, he acted appropriately, made comments and arguments that showed he understood the legal issues in this case, and articulated what appeared to be carefully thought-out responses to questions about the facts as they unfolded over a period of months in 2022.

I find that at the time he received the very first email from Deng, Wheeler suspected that the email—which was from a stranger, was not specifically directed to him, and concerned a business about which he knew nothing—was not legitimate. In fact, Wheeler's testimony that he

thought he might lose the money that he put into registering the company indicated that he correctly surmised that the email was fishy. The only "due diligence" Wheeler did concerning Qingdao consisted of looking it up on the internet. Other than a very vague description of what he found when he did this search, there was no evidence presented about what he saw about the company on the internet. This does not convince me that he did enough research to satisfy himself that the email was a solicitation for a lawful job. I find that he did not care if it was lawful, although I do not find that in this early period he actually knew he was participating in a crime.

The circumstances of Wheeler's employment as an agent for Qingdao, as he worked out his responsibilities with Deng early on and then began working for Deng, surely suggested to Wheeler that the job was for a nefarious purpose. He was told that he would be receiving purchase orders from customers and signed an agreement in broken English to that effect, but in fact all he did was open bank accounts and transfer money. The four percent cut he was to receive from the substantial sums of money he was told would be passing through the bank accounts he set up was, by anyone's standards, too good to be true. It strains credulity that if a company was doing millions of dollars' worth of sales every year and needed help transferring funds to China, they would send out a generic email to persons they did not know asking them to be their agent and then hire a person who knew nothing about international banking to do the work.

Deng made many statements to Wheeler that were not credible. For example, the reason Deng gave for hiring Wheeler: that the company wanted to save taxes, and his explanation that Qingdao needed multiple bank accounts opened "to avoid having many payments on [a] single account," must have aroused Wheeler's suspicion that all was not right. Wheeler's repeated statements that he did not want to mix his contracting business with Qingdao's business demonstrate that he knew that Qingdao's operations were suspect.

I find that based on the events that transpired before Wheeler transferred Pierce-Cooke's money, Wheeler understood that he was participating in an illegal activity. First, the Willow Birch deposit was reversed and the Chase account was locked. Then, likely triggered by the next deposit of around $50,000 which Deng had told Wheeler to expect, the Chase account was closed. Next, Deng informed Wheeler that a payment of about $500,000 would be deposited into the BOA account, which never materialized. When Pierce-Cooke's money was deposited into the BOA account, rather than asking any further questions, going to the authorities, or even simply stopping his activities on behalf of Qingdao, Wheeler went to the bank in person to facilitate the transfer of Pierce-Cooke's money, less his four percent commission. While I find that at this time Wheeler knew that he was participating in illegal activity, I must also find, based on the evidence presented at trial, that at the time he transferred Pierce-Cooke's money out of the BOA account, he did not know precisely what the illegal activity was. There is nothing in the evidence up to this point that proved that he knew the money was stolen from individuals or businesses; it could just as easily have been drug money or proceeds of some other crime.

Shortly after, the BOA account was closed. Still, Wheeler did not take any action to extricate himself from his work with Deng. In fact, when a deposit of about $90,000 was made into the Citizens account, he agreed to "check out" the use of cryptocurrency for his transactions on behalf of Qingdao, even though he testified that he understood it is commonly used by criminal enterprises. Even after the Citizens account was closed, and he received a letter from the bank signed by "Fraud Operations" informing him that the bank would no longer do business with him because of the Qingdao account, he continued communicating with Deng and offering to work for him. At this time, I find, he knew that he was participating in an enterprise involving fraud, although, again, I do not find that he knew details about precisely what type of fraudulent conduct

he was assisting.

The last few emails between Deng and Wheeler cement the finding that Wheeler was unconcerned that what he was doing was wrong. He just wanted to make money. In fact, he testified to that and said that after he learned he had been part of a fraud, and was even charged with a crime, he did not care and only wanted the money he thought was owed to him. While these communications took place after he had transferred Pierce-Cooke's money, I find that they shed light on Wheeler's state of mind throughout his time working with Deng and establish that in spite of clear indications that what he was doing was wrong, Wheeler was motivated to make money, no matter what the source of that money was.

I find that Wheeler never received any money for his efforts on behalf of Qingdao. I credit his testimony that he never received the cashier's check from BOA for approximately $8,300. This finding is supported by Wheeler's repeated reminders to Deng that he had never received the funds and his offers to resume working if Deng would pay him those funds.

Finally, I find that the LLC that Wheeler created was created only for a criminal purpose, that is, to transfer money that had been acquired by scammers. It never conducted any legitimate business. There was no credible evidence presented that "Qingdao Scooters" was an actual business, either, notwithstanding Wheeler's testimony that it had a website which looked legitimate to him.

IV. <u>Conclusions of Law</u>.

    A.  <u>Fraud (Count I)</u>.

Pierce-Cooke states in his proposed conclusions of law that Wheeler is liable for fraud because he acted recklessly when he knowingly registered a fake business, opened a bank account in its name, and moved Pierce-Cooke's money to a third-party scammer. *See* #70 at 23-24. He

asserts that "Wheeler became aware he was involved in a fraudulent or illicit scheme <u>prior</u> to the use of the fraudulent 'Qingdao Harvest LLC' entity to abscond with Pierce-Cooke's money." *Id*. at 24 (emphasis in original). He claims that Wheeler "was, at a minimum, willfully blind to the illicit nature of the scheme in which he was participating," *see id.* at 23, and he "materially omitted and refused to take any action to correct the fraudulent nature of the bank account and the LLC." *Id*. at 24. "But for Wheeler's misrepresentations, Pierce-Cooke would not have suffered the loss." *Id*.

"Under Massachusetts law, a claim of fraudulent misrepresentation requires a plaintiff to show that '(1) the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing [the plaintiff] to act thereon; (2) the plaintiff relied upon the representation as true and acted upon it to his [or her] detriment; and (3) such reliance was reasonable under the circumstances.'" *McCabe v. Ford Motor Co.,* 720 F. Supp. 3d 14, 27 (D. Mass. 2024) (quoting *Gattineri v. Wynn MA, LLC*, 63 F.4th 71, 87-88 (1st Cir. 2023)) (alteration in original) (additional citation and quotations omitted).

The problem with this claim is that Pierce-Cooke did not rely to his detriment on any misrepresentations made by Wheeler when Wheeler registered Qingdao as an LLC, opened a bank account in the name of the company, and then transferred Pierce-Cooke's money out of the account. Pierce-Cooke did not know what Wheeler was doing and had no interactions with him. Certainly, the hacker who intercepted the money and transferred it to the BOA account controlled by Wheeler made fraudulent misrepresentations when he impersonated Pierce-Cooke and directed personnel at Walking the Talk to transfer the money to the BOA account. But the relevant question is whether Wheeler is liable for those misrepresentations.

Is Wheeler liable under a conspiracy theory? Pierce-Cooke does not make this claim or

develop any argument concerning it, so it is waived. Even if it were not waived, however, it would fail. Under Massachusetts law, a person is generally liable for common-law fraud only for fraudulent representations which he makes himself, but an exception to this rule is if he is working as a partner with someone who defrauds another. *See Taylor v. American Chemistry Council*, 576 F.3d 16, 33 (1st Cir. 2009) (citing *Reisman v. KPMG Peat Marwick LLP*, 787 N.E.2d 1060, 1066 (Mass. App. 2003)). This is the "concerted action" theory of civil conspiracy. *Thomas v. Harrington*, 909 F.3d 483, 490 (1st Cir. 2018).[10] "Because it is vicarious liability, this type of civil conspiracy requires an underlying tort" and "[t]he conspiracy consists in agreeing to, or assisting in, this underlying tort." *Taylor*, 576 F.3d at 35 (additional citations omitted). "To prove a 'concerted action' conspiracy, a plaintiff must show that defendants either (1) acted 'in concert with or pursuant to a common design with' the tortfeasor or (2) 'gave substantial assistance to' the tortfeasor's conduct." *Thomas*, 909 F.3d at 490 (quoting *Kyte v. Philip Morris, Inc.*, 556 N.E.2d 1025, 1027 (Mass. 1990) (citing *Taylor*, 576 F.3d at 35)).

"Under the 'common design' theory, a plaintiff must show 'first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement.'" *Id.* (quoting *Aetna Cas. Sur. Co.*, 43 F.3d at 1564). "'[A]n inference of an implied agreement [can] properly be drawn from the conduct of two or more parties." *Id.* (quoting *Kyte*, 556 N.E.2d at 1028) (alterations in original).

The evidence at trial did not prove Wheeler's liability under the "common design" theory because there was no evidence that at the time he transferred Pierce-Cooke's money, he knew what

---

[10] "Massachusetts also recognizes another form of civil conspiracy where 'defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently.'" *Thomas*, 909 F.3d at 490 n.8 (quoting *Aetna Cas Sur. Co., v. P&B Autobody*, 43 F.3d 1546, 1563 (1st Cir. 1994)). This "coercive type" of civil conspiracy is a "'very limited cause of action in Massachusetts[.]'" *Aetna Cas Sur. Co.*, 43 F.3d at 1546 (quoting *Jurgens v. Abraham,* 616 F. Supp. 1381, 1386 (D. Mass. 1985)). This theory does not apply here.

the scheme in which he was participating consisted of. As stated above, for all he knew, the money passing through the account was the proceeds of drug dealing or some other unlawful activity. This does not satisfy the requirement that the plaintiff prove "a common design or an agreement" between Wheeler and whoever hacked Pierce-Cooke's account. *See Kyte*, 556 N.E.2d at 1028.

That leaves the "substantial assistance" theory. Under that theory, "'a person may be liable in tort if he knows that the … conduct [of another person] constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.'" *Thomas*, 909 F.3d at 491 (quoting *Kurker v. Hill*, 689 N.E.2d 833, 837 (Mass. App. Ct. 1998)) (additional citations and quotations omitted) (alteration and ellipsis in original). The plaintiff must establish that the defendant had "an 'unlawful intent,' consisting of both 'knowledge that the other's conduct is tortious[] and an intent to substantially assist or encourage that conduct.'" *Id*. (additional citation omitted) (alteration in original); *see Kyte*, 556 N.E.2d at 1028 ("Evidence of the defendant's knowledge of its substantial, supporting role in an unlawful enterprise is required."). "Merely showing the defendant's 'general awareness' that their ostensible co-conspirator is engaged in tortious acts is insufficient." *Id.* (citing *Kyte*, 556 N.E.2d at 1028).

Wheeler is not liable under the "substantial assistance" theory because, again, there was no evidence that at the time he transferred Pierce-Cooke's money, he knew what crime was being perpetrated that resulted in funds being delivered to his bank accounts. In other words, the evidence showed only that he had a "general awareness" that something illegal was going on, which is not sufficient.[11]

---

[11] Pierce-Cooke also asserts that Wheeler is liable because he did not disclose to anyone that Qingdao and the BOA account were fraudulent. *See* #70 at 24. Again, Pierce-Cooke does not develop any argument with regard to this theory, and it is deemed waived. And, as with the conspiracy claim, even if it were not waived, it would fail. In contrast to misrepresentation, nondisclosure generally does not give rise to liability in tort. *See Wolf v. Prudential–Bache Securities, Inc.*, 672 N.E.2d 10, 12 (Mass. App. Ct. 1996) ("'Nondisclosure does not amount to

Finally, Pierce-Cooke asserts that Wheeler "was, at a minimum, willfully blind to the illicit nature of the scheme in which he was participating." (#70 at 23.) This may well be true, "[h]owever, while willful blindness may establish aiding-and-abetting liability in the criminal context, *see, e.g., United States v. Ford,* 821 F.3d 63, 73-74 (1st Cir. 2016), the Massachusetts Supreme Judicial Court [] has not yet extended this principle to the civil context." *Steiner v. eBay, Inc.*, 795 F. Supp. 3d 144, 169 (D. Mass. 2025). "And '[w]here a state's highest court has not spoken directly,' federal courts are 'not in a position . . . to blaze a new trail.'" *Id.* (quoting *Forbes v. BB&S Acquisition Corp.*, 22 F.4th 22, 25 (1st Cir. 2021)) (additional citation omitted) (alteration and ellipsis in original).

B. <u>Conversion (Count II)</u>.

"Under Massachusetts law, a defendant is liable for conversion if he 'intentionally or wrongfully exercise[s] acts of ownership, control or dominion over personal property to which he has no right of possession at the time.'" *McCormick v. Lischynsky*, 539 F. Supp. 3d 225, 235 (D. Mass. 2021) (quoting *In re Brauer*, 890 N.E.2d 847, 857 (Mass. 2008)) (alteration in original). To prevail on such a claim, a

---

fraud and is not a conventional tort of any kind.'") (additional citation omitted). Liability for nondisclosure exists under Massachusetts law only where there is a duty to disclose. *See Knapp v. Neptune Towers Assocs.*, 892 N.E.2d 820, 824 (Mass. App. Ct. 2008); *see also In re Neurontin Mktg.*, 618 F. Supp. 2d 96, 108-09 (D. Mass. 2009); Restatement (Second) of Torts § 551 (1977). That duty arises where

> (i) there is a fiduciary or other similar relation of trust and confidence, (ii) there are matters known to the speaker that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading, or (iii) the nondisclosed fact is basic to, or goes to the essence of, the transaction.

*Squeri v. Mount Ida College*, 954 F.3d 56, 71 (1st Cir. 2020) (quoting *Knapp*, 892 N.E.2d at 824). Wheeler is not liable for nondisclosure to Pierce-Cooke because he was not in a fiduciary relationship to him and had no duty to disclose anything to him. *See id.* at 70 ("Fraud by omission requires both concealment of material information and a duty requiring disclosure.") (quoting *Sahin v. Sahin*, 758 N.E.2d 132, 138 n.9 (Mass. 2001)).

> plaintiff must show that (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.

*Unum Grp. v. Loftus*, 220 F. Supp. 3d 143, 148 (D. Mass. 2016) (quoting *U.S. v. Peabody Const. Co., Inc.*, 392 F. Supp. 2d 36, 37 (D. Mass. 2005)) (additional citation and quotations omitted); *see Reem Prop., LLC v. Engleby*, 251 F. Supp. 3d 274, 278 (D. Mass. 2017); *see also In re Hilson*, 863 N.E.2d 483, 491 (Mass. 2007) ("The elements of conversion may be established by a showing that one person exercised dominion over the personal property of another, without right, and thereby deprived the rightful owner of its use and enjoyment.") (additional citation omitted).

As recognized by the First Circuit, "[i]t is no defense to conversion for [a] defendant to claim that he acted in good faith, reasonably believing that he had a legal right to possession of the goods." *Kelley v. Laforce*, 288 F.3d 1, 12 (1st Cir. 2002) (additional citation omitted). To be liable, a defendant does not need intent "'to deprive the owner permanently of the property. . . . Rather, one only need intent to exercise dominion or control over the property of another and can be held liable for conversion even if the property over which he exercised control was believed to be his own." *In re Zak*, 573 B.R. 13, 42 (Bankr. D. Mass. 2017) (quoting *In re Sloane*, No. 01-1213-JMD, 2002 WL 1000956, at *6 (Bankr. D.N.H. Mar. 25, 2002)) (additional citation omitted).

Wheeler is liable for conversion of Pierce-Cooke's money. He intentionally and wrongfully exercised control over funds belonging to Pierce-Cooke, had no right of possession at the time he did, and caused Pierce-Cooke harm.

## C. Unjust Enrichment (Count III).

Pierce-Cooke alleges in his complaint that Wheeler "wrongfully took control of the funds Mr. Pierce-Cooke was entitled to receive from Walking the Talk LTD, by establishing a bank

account expressly for the purpose of receiving unlawfully converted funds"; Pierce-Cooke has not recovered any of the money he lost; and Wheeler "benefitted from the wrongful delivery of the funds[.]" (#1 ¶¶ 25-27.)

Under Massachusetts law, "[u]njust enrichment is the 'retention of money or property of another against the fundamental principles of justice or equity and good conscience.'" *Columbia Plaza Associates. v. Northeastern University*, 227 N.E.3d 999, 1018 (Mass. 2024) (quoting *Sacks v. Dissinger*, 178 N.E.3d 388, 397 (Mass. 2021)). To succeed on an unjust enrichment claim, Pierce-Cooke must show that (1) he conferred a measurable benefit on Wheeler, (2) he reasonably expected compensation from Wheeler, and (3) Wheeler accepted the benefit with knowledge of Pierce-Cooke's reasonable expectation. *Id*. at 1018 (citing *Stewart Title Guar. Co. v. Kelly*, 146 N.E.3d 1142, 1151 (Mass. App. Ct. 2020)). Pierce-Cooke did not prove that Wheeler ever received any money for his efforts to assist Deng. Therefore, Pierce-Cooke has not met the first element of this claim and it fails as a matter of law. *See id*. (unjust enrichment claim rejected where the record did not establish a monetary or property benefit that the Plaintiff conferred on Northeastern); *see also Tody's Service, Inc., v. Liberty Mutual Insurance Co*., 260 N.E.3d 309, 313 (Mass. 2025) (insurer did not receive measurable, nonspeculative benefit from towing company arising from towing company's storage of vehicle at police direction, and therefore insurer was not unjustly enriched); *Tedeschi-Freij v. Percy Law Group*, *P.C.,* 172 N.E.3d 774, 780-83 (Mass. App. Ct. 2021) (attorney's unjust enrichment claim, based on law firm's continued use of her name after she left the firm, failed as a matter of law where there was no evidence that the firm derived quantifiable benefit from the continued use of her name).

D. <u>Negligent  Misrepresentation (Count IV)</u>.

Pierce-Cooke makes the same argument for finding Wheeler liable for negligent misrepresentation as he does for his claim of fraud: that Wheeler recklessly registered a fake

business, opened a bank account for the business, and transferred Pierce-Cooke's money to a fraudster. *See* #70 at 23-24.

A defendant is liable for negligent misrepresentation "'if in the course of his business, he supplies false information for the guidance of others in their business transactions, causing and resulting in pecuniary loss to others by their justifiable reliance on the information, with failure to exercise reasonable care or competence in obtaining or communicating the information." *Amorim Holding Financeria, S.G.P.S., S.A. v. C.P. Baker & Co.,* 53 F. Supp. 3d 279, 300 (D. Mass. 2014) (quoting *Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1031 n.25 (Mass. 2004)). As in fraudulent representation, the plaintiff must show "(1) that the defendant made a misrepresentation or omitted a fact; (2) that the statement was material; (3) that the defendant knew or should have known it was false; and (4) that the plaintiff reasonably relied on the misrepresentation." *Id*. Negligent misrepresentation, however, unlike fraudulent misrepresentation, "'does not require a showing that the defendant even knew that the statements made were false or that the defendant actually intended to deceive the plaintiff.'" *Id.* (quoting Marram, 809 N.E.2d at 1031 n.25) (additional citation omitted).

For the same reasons set out above regarding fraudulent misrepresentation, namely, that there was no evidence that Pierce-Cooke relied on any misrepresentation made by Wheeler, I find that Wheeler is not liable for this claim.

E.    Unfair and Deceptive Business Practices under Mass. Gen. Laws Chapter 93A (Count V).

1. Chapter 93A – Generally.

Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Mass. Gen. Laws ch. 93A, § 2(a). The statute provides a cause of action to "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property . . . as a result of the use or employment by another person who engages in any trade

or commerce of an unfair method of competition or an unfair or deceptive act or practice declared

unlawful by section two[.]" *Id.* § 11.

A claim under Chapter 93A, § 11 has three elements:

> (1) the defendant engaged in an unfair method of competition or committed an
> unfair deceptive act or practice; (2) a loss of money or property was suffered; and
> (3) the defendant's unfair or deceptive method, act or practice caused the loss
> suffered.

*Anoush Cab, Inc. v. Uber Techs., Inc.*, 8 F.4th 1, 16 (1st Cir. 2021) (citing *Auto Flat Car Crushers,*

*Inc. v. Hanover Ins. Co.*, 17 N.E.3d 1066, 1074-75 (Mass. 2014)).

a. Unfair or Deceptive Act or Practice.

What constitutes an unfair or deceptive act or practice is not defined by the statute. As the

Massachusetts Supreme Judicial Court ("SJC") has observed, "[s]uch a definition would be

impossible" where "'there is no limit to human inventiveness in this field.'" *Kattar v. Demoulas*,

739 N.E.2d 246, 257 (Mass. 2000) (additional citation omitted). Instead, "unfair or deceptive

conduct is best discerned 'from the circumstances of each case.'" *Anoush Cab, Inc.*, 8 F.4th at 17

(quoting *Kattar,* 739 N.E.2d at 257) (additional citation omitted). In determining what conduct

"rises to the level of an unfair act or practice[,]" courts have "consistently" looked to:

> (1) whether the conduct is within 'at least the penumbra of some common-law,
> statutory, or other established concept of unfairness; (2) whether it is immoral,
> unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial
> injury to consumers or other businesses[.]

*H1 Lincoln, Inc. v. South Washington Street, LLC*, 179 N.E.3d 545, 557 (Mass. 2022) (quoting

*PMP Assocs., Inc. v. Globe Newspaper Co.,* 321 N.E.2d 915, 917 (Mass. 1975)) (first alteration in

original). The "'crucial factors' in an unfairness inquiry are 'the nature of [the] challenged conduct

and [] the purpose and effect of that conduct." *In re Pharmaceutical Industry Average Wholesale*

*Price Litigation*, 582 F.3d 156, 184-85 (1st Cir. 2009) (quoting *Mass. Employers Ins. Exch. v.*

*Propac-Mass, Inc*., 648 N.E.2d 435, 438 (Mass. 1995)) (additional citation omitted) (first

alteration in original).

"[T]he SJC has repeatedly held that mere negligence, standing alone, is not sufficient for a violation of ch. 93A—something more is required." *Baker v. Goldman, Sachs & Co.*, 771 F.3d 37, 51 (1st Cir. 2014) (citing *Klairmont v. Gainsboro Rest., Inc.,* 987 N.E.2d 1247, 1257 (Mass. 2013); *Darviris v. Petros*, 812 N.E.2d 1188, 1192 (Mass. 2004); and *Swanson v. Bankers Life Co.*, 450 N.E.2d 577, 580 (Mass. 1983)) (additional quotations omitted). Negligent conduct, however, "may be so extreme or egregious" as to constitute a violation of Chapter 93A. *Marram*, 809 N.E.2d at 1032; *see Anoush Cab, Inc.* 8 F.4th at 18-19 (citing *Marram*, 809 N.E.2d at 1032; and *Baker,* 771 F.3d at 51).

### b. Commercial Transaction Requirement.

The question whether certain acts or practices are unfair or deceptive is a question of fact, but a ruling on what conduct violates Chapter 93A is a legal determination. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d at 184. Whether Chapter 93A § 11 applies to conduct "requires a dual inquiry whether there was a commercial transaction between a person engaged in trade or commerce and another person engaged in trade or commerce, such that they were acting in a 'business context.'" *Milliken & Co. v. Duro Textiles, LLC*, 887 N.E.2d 244, 259 (Mass. 2008) (citing *Linkage Corp. v. Trustees of Boston Univ.*, 679 N.E.2d 191, 206-07 (Mass. 1997)) (additional citations omitted); *see Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 186 (1st Cir. 2023) ("[T]he statute applies to transactions that are commercial in nature between parties engaged in 'trade or commerce'") (additional citations omitted); *see also Rafferty v. Merck & Co.*, 92 N.E.3d 1205, 1223 n.7 (Mass. 2018) (noting that Chapter 93A § 11 claim requires commercial transaction between parties). In this analysis, the question whether a commercial transaction exists is the primary one. *See Santander Consumer USA Inc. v. Walsh*, 762 F. Supp. 2d 217, 241 (D. Mass. 2010) (explaining that the two-part evaluation for Chapter 93A § 11 claims considers whether the

parties were engaged in trade or commerce "only after it has been established that a commercial transaction exists") (additional citation and quotations omitted). "To determine whether a defendant is engaged in trade or commerce for Chapter 93A purposes," a court should consider "(1) the nature of the transaction; (2) the character of the parties involved; (3) the activities engaged in by the parties; and (4) whether the transaction was motivated by business or personal reasons." *Shirokov v. Dunlap, Grubb & Weaver, PLLC,* Civil Action No. 10-12043-GAO, 2021 WL 1065578, at *35 (D. Mass. Mar. 27, 2012) (citing *Feeney v. Dell, Inc.*, 908 N.E.2d 753, 770 (Mass. 2009)).[12]

c. Discussion.

In his proposed conclusions of law, Pierce-Cooke argues that the evidence at trial established that Wheeler violated Chapter 93A in three ways: first, his actions were unfair and deceptive under the statute; second, his conduct violated the Federal Trade Commission Act, 15 U.S.C. § 41, and violations of that law constitute per se violations of Chapter 93A; and third, he was acting as an unregistered money services business as defined under federal law. *See* #70 at 18-22.

Before trial, Pierce-Cooke moved for partial summary judgment on his Chapter 93A claim. (#20.) I denied the motion, finding that, on the summary judgment record, Wheeler interfered with "trade or commerce" when he facilitated the interception of funds owed to Pierce-Cooke, but there

---

[12] The terms "trade" and "commerce" are defined in Chapter 93A, § 1(b) to include

the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property, tangible or intangible, real, personal or mixed, any security as defined in [Mass. Gen. Laws ch. 110A, § 401(k)], and any contract of sale of a commodity for future delivery, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth.

Mass. Gen. Laws ch. 93A, § 1(b).

was a material question of fact as to whether Wheeler had acted knowingly or at least with "extreme or egregious" negligence as the statute requires. (#34 at 10-13.) After hearing the evidence at trial, however—which established that Wheeler's work with Qingdao was only for a criminal purpose and not for any business purpose—I find that the transaction between Pierce-Cooke and Wheeler cannot be said to have been a "commercial transaction" that brings it within the ambit of Chapter 93A.

Although Wheeler's actions were unquestionably deceptive and unfair under Chapter 93A, there is no evidence that the BOA account was used for any business purpose, as Pierce-Cooke concedes in his proposed findings of fact, *see* #70 at 23. Pierce-Cooke cites no case, and I have found none, in which a criminal actor, setting up a bank account for solely criminal purposes, is liable under Chapter 93A to the victims of his crime. The paucity of caselaw on this issue is evidence that the argument has no merit. One case, *Stop & Shop Supermkt. Co. v. Loomer*, 837 N.E.2d 712 (Mass. App. Ct. 2005), makes clear that even when a defendant commits a crime against a business, the commercial transaction requirement still must be met. In that case, the court found no business-to-business transaction for purposes of Chapter 93A where a supermarket employee and her husband cashed checks for the husband's business at the supermarket despite knowing there were insufficient funds in their joint checking account. *Id*. at 718-19. In other words, the passing of fraudulent checks was not a violation of Chapter 93A because even though the supermarket was a business and the checks arguably were cashed on behalf of the husband's business, there was no commercial relationship between them. So too, here, Pierce-Cooke was not engaging in any sort of business with Wheeler. In sum, because the "commercial transaction" requirement is not met, the claim fails.

F. <u>Violation of the Computer Fraud and Abuse Act (Count VI).</u>

Pierce-Cooke asserts that Wheeler is liable under the Computer Fraud and Abuse Act, 18

U.S.C. § 1030 et seq. (the "CFAA"). *See* #70 at 27-28. Although the CFAA is a criminal statute, it provides that a person may bring a civil action if the person has suffered "damage or loss by reason of a violation" of the statute. 18 U.S.C. § 1030(g). The CFAA thus imposes liability for anyone who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value[.]" 18 U.S.C. § 1030(a)(4). Section 1030(b) of the CFAA extends liability to anyone who "conspires to commit" such acts. 18 U.S.C. § 1030(b).

Obviously, Wheeler is not himself liable for accessing Pierce-Cooke's computer; rather, Pierce-Cooke proceeds on a theory of conspiracy. He alleges that Wheeler

> actively participated in a scheme that used Pierce-Cooke's hacked email to misdirect funds and steal those funds from Pierce-Cooke. . . . Wheeler was an essential part of that scheme and provided the domestic limited liability company 'front' through which he was able to open a domestic bank account and funnel Pierce Cooke's money to the Chinese Hacker.

(#70 at 28.)

While no case in the First Circuit directly addresses civil conspiracy claims under the CFAA, there are out-of-circuit cases that do so. "A claim under section 1030(b) requires 'specific allegations of an agreement and common activities.'" *Ryanair DAC v. Booking Holdings Inc.,* 636 F. Supp. 3d 490, 510 (D. Del. 2022) (quoting *In re Lenovo Adware Litig.*, No. 15-md-02624-RMW, 2016 WL 6277245, at *6 (N.D. Cal. Oct. 27, 2016); *see NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 835 (N.D. Cal. 2014); *Trademotion, LLC v. Marketcliq, Inc.*, 857 F. Supp. 2d 1285, 1294 (M.D. Fla. 2012); *Vacation Club Servs., Inc. v. Rodriguez*, Civil Action No. 6:10-247ORL31GJK, 2010 WL 1645129, at *2 (M.D. Fla. Apr. 22, 2010).

Again, since there was no evidence at trial that Wheeler entered into any agreement with the hacker who infiltrated Pierce-Cooke's email account and stole his money, this claim fails.

V. <u>Damages.</u>

As discussed above, I find Wheeler liable to Pierce-Cooke under Count II of the complaint, Conversion. (#1 ¶¶ 24-27.) In his complaint, Pierce-Cooke seeks compensatory damages in the amount of $208,951.98—the amount of the intercepted wire funds——in addition to prejudgment interest. *Id.* at 9, ¶ 1.

"[S]tate law governs the issue of prejudgment interest when a plaintiff recovers under a state law cause of action, regardless of whether jurisdiction in federal court is based upon diversity or whether it is pendent to a federal claim." *Advanced Cable Ties, Inc. v. Bay State Cable Ties*, LLC, Civil Action No. 06-40204-FDS, 2009 WL 10730417, at *1 (D. Mass. July 28, 2009) (quoting *Mill Pond Associates, Inc., v. E & B Giftware, Inc.*, 751 F. Supp. 299, 300 (D. Mass. 1990)) (alteration in original). Although, under Mass. Gen. Laws ch. 231, § 6B ("Interest added to damages in tort actions") interest "at the rate of twelve per cent per annum" accrues beginning "from the date of commencement of the action[,]" Massachusetts courts "'have traditionally awarded interest measured from the date of the conversion.'" *Sourcing Unlimited, Inc. v. Elektroteks, LLC*, Civil Action No. 20-11955-ADB, 2024 LEXIS 107569, at *15 (D. Mass. June 13, 2024) (awarding prejudgment interest as of the date of conversion) (quoting *Steranko v. Inforex, Inc.*, 395 N.E.2d 1303, 1310 n.6 (Mass. App. Ct. 1979)).

In this case, Wheeler converted Pierce-Cooke's funds on June 10, 2022, the date the BOA account Wheeler controlled received the $208,951.98 deposit belonging to Pierce-Cooke, and, therefore, the date Wheeler wrongfully assumed control of the intercepted funds. Accordingly, in addition to compensatory damages in the amount of $208,951.98, Pierce-Cooke is entitled to prejudgment interest at a rate of twelve percent per annum on damages of $208,951.98, from June 10, 2022 until the date of Judgment.

VI. <u>Conclusion</u>.

      For the reasons set out above, I find that Pierce-Cooke has met his burden of proof on Count II, Conversion. I award him $208,951.98 in compensatory damages, plus prejudgment interest at a rate of twelve percent per annum on that sum from June 10, 2022, until the date of Judgment. Judgment to follow.

February 24, 2026                                    <u>/s/ M. Page Kelley</u>
                                                    M. Page Kelley
                                                    United States Magistrate Judge